**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Eddie Lee Richardson, a/k/a Hotwire the Producer, | |
| Plaintiff, | No. 19 CV 02321 |
| v. | Honorable Nancy L. Maldonado |
| Karim Kharbouch, a/k/a French Montana, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

This is the second time this case comes before the Court on summary judgment, this time to resolve potentially dispositive issues that were largely ignored in the parties' first round of briefing. Plaintiff Eddie Lee Richardson, who goes by Hotwire the Producer, brings this action for copyright infringement against Defendant Karim Kharbouch—a hip-hop artist who performs under the name French Montana. Richardson claims that Kharbouch's hit single, "Ain't Worried About Nothin'" ("AWAN"), infringes on Richardson's copyright in his own original music recording, "*Hood* Pushin' Weight" ("HPW"). After the close of discovery, the parties filed cross-motions for summary judgment. On March 30, 2023, the Court granted Kharbouch's motion in part, limiting the scope of Richardson's claims and his potential damages, and denied Richardson's motion in full, finding that he had failed to demonstrate that he was entitled to judgment as a matter of law on his claims for infringement.

In reaching its ruling, the Court observed that there was an aspect of the record that was underdeveloped and not sufficiently addressed in the parties' briefing: whether Richardson could pursue his claim for copyright infringement against Kharbouch at all, given that Richardson's

1

copyright in HPW was for a "sound recording" only. The Copyright Act distinguishes between sound recordings of music and the underlying musical composition itself, and confers more limited exclusive rights to the owner of a sound recording than it does to the owner of a musical composition copyright. Apart from a passing comment in Kharbouch's reply brief, however, the parties' first round of summary judgment briefing did not address this distinction between the types of copyrights, or whether Richardson's registration of only a sound recording copyright impacted the scope of his claims. The Court therefore determined that supplemental briefing was necessary, and the Court granted Kharbouch leave to file a second motion for summary judgment addressing whether he could be held liable for copyright infringement when Richardson held only a sound recording copyright.

Kharbouch's supplemental motion for summary judgment is now fully briefed and, for the reasons stated in this Opinion and Order, the motion is granted. In sum, while Richardson has offered some evidence of similarity in the underlying sounds and musical melodies between the two works, this evidence is not sufficient for Richardson to create a triable issue of fact on copyright infringement of his sound recording. Unfortunately for Richardson, his express admission in this case that he has only a sound recording copyright, and not one for a musical composition, means that he does not have exclusive rights in the generic sounds or melodies of HPW. Instead, Richardson's sound recording copyright only provides him with exclusive rights in the *actual recording* of HPW. But Richardson has failed to come forward with any admissible evidence suggesting that AWAN was created by duplicating or sampling any portion of the recording of HPW, and the mere fact that the songs may share certain musical elements is simply not enough for a jury to conclude that such sampling actually occurred. The Court therefore concludes that Kharbouch is entitled to judgment as a matter of law.

**Background**

**A. The parties' continued non-compliance with Local Rule 56.1**

Before the Court sets forth the relevant factual background, a few preliminary comments are warranted to address the parties' failure, for the second time, to comply with the requirements for summary judgment practice in this District, as set forth in Northern District of Illinois Local Rule 56.1. In the Court's prior opinion addressing the first round of summary judgment briefing, the Court set forth, in extensive detail, the requirements for statements of material fact under Local Rule 56.1, and the Court noted the various ways in which the parties had failed to comply with those requirements. (Dkt. 86 at 2–5)[1]; *see also Richardson v. Kharbouch*, No. 19 CV 02321, 2023 WL 2711480, at *1–3 (N.D. Ill. Mar. 30, 2023). Both parties, for example, failed to submit proper responses to their opponents' statements of material fact, which could have resulted in the Court summarily deeming facts admitted. (Dkt. 86 at 3–4); *see* N.D. Ill. L.R. 56.1(e)(3). Ultimately, however, the Court largely excused the parties' noncompliance with the Local Rules in the interest of resolving the motions on their merits, and not on mere technicalities. (*See* Dkt. 85 at 5.)

The Court would have expected that its detailed recitation of the Local Rules in its prior opinion, and its warnings about the implications of failing to comply with the rules, would have been an obvious signal to the parties' counsel that they should ensure their subsequent summary judgment briefing strictly adhered to those rules. Yet, once again, the parties' filings fail to comply with Local Rule 56.1 in the exact same manner as their prior submissions. While each party has submitted a statement of material facts, neither party filed any response to the opposing parties' statement of facts as required under Local Rules 56.1(b)(2) and (c)(2). Richardson only filed his own affirmative statement of facts (technically a statement of additional facts under Local

---

[1] In citations to the docket, page numbers are taken from the CM/ECF headers, except when the Court cites to deposition testimony, in which case the Court will cite to the internal transcript page and line number.

56.1(b)(3)). (Dkt. 92.) And Kharbouch's reply submission does not include any response to Richardson's statement of additional facts, though he does raise objections to some of Richardson's asserted facts within the body of his reply brief. The parties' failure to respond to each other's statements in the manner mandated by Local Rule 56.1 could be grounds for the Court to simply deem each parties' asserted facts admitted. *See* N.D. Ill. L.R. 56.1(e)(3) ("Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material.").

Despite counsel's failures, the Court will once again excuse the parties and decline to strictly enforce the Local Rule in these circumstances. *Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 770 (7th Cir. 2013) ("[W]e have repeatedly held that the district court has broad discretion to require strict compliance with local rules or to relax the rules and excuse noncompliance."). The Court does so begrudgingly; the Local Rules are not mere suggestions, but a "critical, and mandatory component of summary judgment practice" in the Northern District of Illinois. *See Abdel-Ghaffar v. Ill. Tool Works, Inc.*, No. 12 C 5812, 2015 WL 5025461, at *6 (N.D. Ill. 2015), *aff'd*, 706 F. App'x 871 (7th Cir. 2017). The requirements in the local rules serve a vital purpose in guiding the often-times complex and unwieldy summary judgment process, making it more efficient for all involved. Counsel's failure to follow Local Rule 56.1, especially after the Court specifically admonished them about the importance of the rule and consequences of non-compliance, would support not only deeming facts admitted, but also imposing sanctions against counsel. *See, e.g.*, *Lippert Components Mfg., Inc. v. MOR/ryde Int'l, Inc.*, No. 3:14-CV-1999-JD-CAN, 2016 WL 11818536, at *3 (N.D. Ind. May 26, 2016) ("Courts may impose sanctions for failure to obey its orders or local rules.") (citations omitted).

Having said all this, while the Court would be justified in simply deeming each side's facts admitted, doing so would needlessly complicate the factual record and make the Court's resolution

4

of the instant motions more, not less, difficult. As will be discussed further below, many of Richardson's asserted facts in particular are not properly supported by admissible evidence in the record. The Court is first and foremost concerned with resolving disputes on their merits, and reaching the result that is required under the law. The Court would do a disservice to these goals and the efficient administration of justice if it allowed Richardson's claim to proceed to trial based solely on the grounds that Defense counsel failed to comply with Local Rule 56.1, when admissible evidence does not otherwise support that result. The Court thus concludes that the best of the bad options before it is to excuse both parties' failure to abide by the Local Rules, and to independently assess the factual record and whether the parties' asserted facts are properly supported.

## B. Factual Background

The Court turns to the factual record on summary judgment. While the Court set forth the factual background in its prior opinion, the Court does so again here based on the undisputed facts and evidence presented in the parties' new round of Local Rule 56.1 statements.[2] The Court has added further details from the factual record as stated in its prior opinion, (Dkt. 86), to the extent those details provide necessary context to its decision. *See* Fed. R. Civ. P. 56(c)(3) (providing that courts "may consider other materials in the record" when resolving motions for summary judgment).

In 2012, Plaintiff Eddie Lee Richardson—then just sixteen years old and an aspiring music producer—composed the original piece of music HPW. (Dkt. 92-1 ¶ 1). According to Richardson, HPW is a "unique fixation of a series of sounds consisting of a snare, 808, high hat, rim shot, cymbal, low brass, piano bells, tubular bells, kick drum, strings, soft leads, hard leads, and orchestra hits." (*Id.*) With the exception of the vocal phrase "Hotwire," which Richardson

---

[2] The Court cites in particular to Kharbouch's statement of uncontroverted material facts, (Dkt. 91-2), and Richardson's statement of "facts in support of Plaintiff's response." (Dkt. 92-1.)

interspersed throughout HPW to tag the work as his own, HPW is purely instrumental. (Dkt. 86 at 5.) On October 7, 2012, Richardson published HPW to SoundClick.com, which he previously described as an "online audio distribution and music sharing website that enables its users to upload, promote, and share audio." (Dkt. 92-1 ¶ 1; Dkt. 86 at 5–6.) According to Richardson, SoundClick.com "is widely known by music producers and artists." (Dkt. 86 at 6; Dkt. 69-2 ¶ 2.)

On April 15, 2013, roughly six months after Richardson uploaded HPW to SoundClick.com, Kharbouch released AWAN. (Dkt. 91-2 ¶ 1.) AWAN proved immensely popular, reaching number 10 on the Billboard charts and inspiring collaborations with some of the music industry's biggest names, including Lil Wayne, Puff Daddy, Wiz Khalifa, Miley Cyrus, and The Game. (Dkt. 86 at 6.) On May 7, 2013, Kharbouch posted the official music video for AWAN to his YouTube channel, which has since accumulated more than 98 million views. (*Id.*; Dkt. 92-1 ¶ 10.)

Kharbouch has admitted that he "contributed to the creation of AWAN by writing its lyrics," and that he contributed to the "creation and performance of remixes to AWAN." (Dkt. 86 at 6; Dkt. 91-2 ¶ 7.) But Kharbouch claims that AWAN's underlying music was created by others. (Dkt. 86 at 6.) Specifically, in answer to one of Richardson's interrogatories, Kharbouch explained that the music for AWAN was created by a team of three producers—Richard Preston Butler, Jr., known professionally as "Rico Love," Earl Hood, and Eric Goudy. (*Id.*) (citing Dkt. 66-10 at 6). Rico Love was apparently the driving force behind AWAN, and allegedly created the music for it in Miami. (*Id.*)

Richardson first heard AWAN around May 5, 2013, and immediately formed the opinion that AWAN's underlying beat copied certain aspects of HPW. (Dkt. 91-2 ¶ 2; Dkt. 92-1 ¶ 1.) As will be discussed further below, Richardson's contention as to *how* it is that AWAN copies HPW

has shifted drastically from the first round of summary judgment briefing to the instant motion. For the purposes of background here, Richardson previously claimed, relying on an expert report, that AWAN's underlying musical melody was copied from HPW. Now, however, Richardson relies on his own affidavit to claim that the same "series of sounds" that are present in HPW— *i.e.*, the unique combination of a snare, 808, high hat, rim shot, cymbal, low brass, etc.— can be heard in AWAN. (Dkt. 92-1 ¶ 1.)[3]

In light of the apparent similarities between AWAN and HPW, Richardson immediately contacted Kharbouch on Twitter, provided a link to HPW on SoundClick.com, and demanded that Kharbouch provide credit to Richardson for AWAN. (Dkt. 92-1 ¶ 16.) Kharbouch responded by telling Richardson that he should reach out to Rico Love. (*Id.*; Dkt. 86 at 7.) The conversation between Richardson and Kharbouch appears to have ended there, and Richardson subsequently reached out directly to Rico Love on Twitter. (Dkt. 86 at 7.) There is no record of that conversation between Richardson and Rico Love, and Richardson does not recall exactly what was said. (*Id.*) Richardson testified in his deposition, however, that after he and Rico Love exchanged messages, Richardson still believed that AWAN copied the beat of HPW, though he felt at the time that there was no way for him to know how the copying was done, or whether it had been done by Rico Love or another party. (*Id.*; Dkt. 66-6 at 80:22–81:7.)

Over the course of the next several years, Kharbouch performed AWAN in public hundreds of times, including at least 378 times during the applicable statutory period from April 5, 2016 to present. (Dkt. 92-1 ¶ 9; Dkt. 91-2 ¶ 18.)[4] The parties' Local Rule 56.1 statements do not point to

---

[3] Richardson presents it as an affirmative fact that the "same sounds" that are present in HPW can be heard in AWAN. (Dkt. 92-1 ¶ 1.) But as will be discussed further below, Richardson has no firsthand knowledge as to how the music for AWAN was created. That kind of evidence would have come from the music producers. Therefore, Richardson's statement in his affidavit that he can hear the same series of sounds in both works is a matter of his opinion, and not probative of the creation of AWAN.

[4] In the first round of summary judgment briefing, Richardson conceded that he could only seek relief for acts of alleged infringement that occurred after April 5, 2016, based on the three-year statute of limitations applicable to

any specific evidence describing the manner in which Kharbouch performed AWAN on any of those 378 occasions. For his part, Richardson claims that the Court can take judicial notice of the fact that hip-hop vocalist performers routinely use digital audio equipment at concerts to mix and transmit recorded sounds to concert attendees, and he contends that Kharbouch, who has admitted that he is merely a vocalist, must have "necessarily" used such digital equipment to transmit a "backing track" when publicly performing the lyrics of AWAN. (Dkt. 92-1 ¶¶ 6–8.) As will be discussed below, Richardson is mistaken as to what facts may be properly considered at summary judgment by judicial notice, and the Court may not assume, as Richardson suggests, that Kharbouch must "necessarily" have used digital backing tracks.

**C. Richardson's copyright registration and the procedural history of this infringement suit**

On May 6, 2013—the day after Richardson first heard AWAN and messaged Kharbouch—Richardson registered HPW with the U.S. Copyright Office as a sound recording. (Dkt. 92-1 ¶ 2; Dkt. 92-4.)[5] Richardson did not immediately file suit, however, due to his young age and his difficulty in finding an attorney. (Dkt. 86 at 8.) Eventually, on April 5, 2019, Richardson initiated this copyright infringement suit against Kharbouch and an unregistered publishing company named Excuse My French ("EMF"). (Dkt 69-1 ¶ 11; Dkt. 1 ¶ 3.) Richardson alleged that EMF was owned and controlled by Kharbouch and publishes, produces, and distributes music in this judicial district. (Dkt. 1 ¶ 3.)

After some initial proceedings, Richardson filed an Amended Complaint on January 11, 2021, which dropped EMF as a party, leaving Kharbouch as the sole defendant. (Dkt. 51.) Notably,

---

copyright infringement actions. (Dkt. 86 at 11, 25); *see also* 17 U.S.C. § 507(b) ("No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued.").

[5] Richardson's copyright in HPW was actually registered as part of a compilation of at least 30 songs, which Richardson collectively titled "Hotwire's Instrumentals." (Dkt. 86 at 7.)

Richardson did not seek to add any other publishing company or alleged producer of AWAN, such as Rico Love, as a defendant in the place of EMF. In Count I of the Amended Complaint (the operative complaint), Richardson brings a claim for copyright infringement against Kharbouch based on his performances and distribution of AWAN. (Dkt. 51 at 5–6.) In Count II, Richardson asserts a separate cause of action for willful copyright infringement, based on his claim that he put Kharbouch on notice of his acts of infringement when he contacted him on May 5, 2013, and Kharbouch nonetheless continued to distribute and perform AWAN. (Dkt. 51 at 6–7.)

After the filing of the Amended Complaint, the parties proceeded to conduct fact discovery, which they completed in September 2021. According to the parties' status reports on discovery, the parties exchanged written discovery, and Kharbouch deposed Richardson, but Richardson waived deposing Kharbouch, or any other witness for that matter, including any of the alleged producers of AWAN who could have testified as to its creation. (Dkt. 64.) The parties subsequently proceeded to file cross-motions for summary judgment. (Dkt. 69; Dkt. 75.) Richardson moved for judgment as a matter of law on both of the claims in the Amended Complaint. Kharbouch, on the other hand, filed a partial motion for summary judgment, arguing that: (1) Richardson was limited to recovery for acts of infringement after April 5, 2016; (2) Richardson was limited to statutory damages, because he had not provided evidence of actual economic harm; (3) Richardson was limited to *one* award of statutory damages; and (4) any alleged infringement was innocent, or at least was non-willful. (Dkt. 66.)

On March 30, 2023, the Court issued its Memorandum Opinion and Order granting Kharbouch's motion in part, and denying Richardson's motion in full. (Dkt. 86); *see generally Richardson*, 2023 WL 2711480. The Court held that Richardson is limited to recovering only for any acts of infringement occurring after April 5, 2016; is limited to statutory, and not actual

damages; and further, is limited to one award of statutory damages. (*See* Dkt. 85; Dkt. 86 at 25–28.) The Court denied Kharbouch's motion with respect to the issues of willfulness or innocence, however, finding that there was a genuine dispute of fact as to whether any alleged infringement was willful or innocent in light of Richardson's messages to Kharbouch. (*See id.*) The Court also denied Richardson's motion for summary judgment, finding that Richardson had failed to establish as a matter of law that AWAN actually copied HPW's melody. (*See* Dkt. 86 at 20–25.)

As noted at the outset, in reaching its ruling on the parties' cross-motions for summary judgment, the Court observed a potentially dispositive issue that the parties' briefing had largely ignored. In his affirmative motion for summary judgment, Richardson indicated that he was no longer seeking to hold Kharbouch liable for any alleged distribution of AWAN, but rather was only seeking to hold him liable for his public performances of AWAN. (*Id.* at 14.) Richardson's limitation of his infringement claim to Kharbouch's performances was important because Richardson registered HPW as a sound recording, and not a musical composition, which meant that his performance rights were limited to those done by "digital audio transmission." The parties' briefing and factual record did not address whether any of Kharbouch's public performances were done by digital audio transmission. Nor did Richardson acknowledge that his registration of HPW as a sound recording, as opposed to a musical composition, would impact the nature and scope of his claims for infringement. Kharbouch, for his part, vaguely alluded to the issue in his reply brief, arguing in passing that Richardson's registration of HPW as a sound recording meant that it "would only be the unauthorized use of HPW's sound and not any performance of HPW that would be an infringement of the registered copyright." (Dkt. 81 at 6.)

Given the potential implications for the scope of Richardson's claims, and the fact that Kharbouch had only briefly mentioned the issue for the first time in a reply, the Court determined

10

that further summary judgment briefing was appropriate (though the Court first encouraged the parties to engage in settlement discussions, which were unsuccessful). The Court eventually granted Kharbouch leave to file a second motion for summary judgment. The Court instructed the parties that they should not relitigate legal issues or factual disputes resolved as part of the first round of briefing, but rather "address the limited issue of whether any of Defendant's allegedly infringing conduct implicates the Plaintiff's rights in a sound recording copyright." (Dkt. 90.) Kharbouch proceeded to file his motion for summary judgment on September 8, 2023, and briefing concluded on October 10, 2023. (Dkts. 91–93.)

### Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if its determination by the trier of fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute with respect to such a fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. If so, a motion for summary judgment must be denied, no matter how overwhelmingly "the evidence . . . favors" the movant. *Id.*

A court's "function" at this stage "is not . . . to weigh the evidence and determine the truth of the matter," but rather to determine "whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented." *Id.* at 249, 252. In conducting this inquiry, courts must "view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Holloway v. City of Milwaukee*, 43 F.4th 760, 765 (7th Cir. 2022). However, "it is not the court's job to 'scour the record in search of evidence to defeat a motion for

summary judgment.'" *Hildreth v. Butler*, 960 F.3d 420, 429–30 (7th Cir. 2020) (quoting *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008)). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead" point to specific "evidentiary materials" demonstrating a genuine issue for trial. *Harney*, 526 F.3d at 1104 (7th Cir. 2008). All evidence submitted in support of, or in opposition to, summary judgment must be admissible at trial. *See Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017) ("To be considered on summary judgment, evidence must be admissible at trial, though the form produced at summary judgment need not be admissible.") (citation and internal quotation omitted); *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022) ("[S]ummary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.") (citations omitted).

### Discussion

Kharbouch raises two primary arguments in his supplemental motion for summary judgment. First, he argues that Richardson's registration of a sound recording copyright alone is fatal to his claims for copyright infringement, because Richardson has failed to come forward with any evidence demonstrating that AWAN copies or duplicates the actual recording of HPW. Second, Kharbouch argues that, even if Richardson could establish copying, he cannot pursue his claims based on Kharbouch's performances of AWAN, because there is no evidence that any were done by digital audio transmission.

The Court will first address the applicable legal framework, and then will turn to Kharbouch's arguments. Because the Court ultimately agrees with Kharbouch's first argument that Richardson has failed to come forward with evidence demonstrating that AWAN copies or

12

duplicates the actual recording of HPW, the Court need not resolve all the other issues raised in the parties' briefing.

### A. Legal Framework for Copyright Infringement of Sound Recordings

The Court begins its discussion by setting forth the legal standards applicable to Richardson's claim for copyright infringement. Although the Court set forth many of these standards in detail in its prior opinion, it is important to do so again here to provide context for the Court's decision, as well as to emphasize the standards applicable to infringement actions involving sound recordings in particular.[6]

#### 1. General Standards for Proving Copyright Infringement

In general, a plaintiff must prove two elements to establish copyright infringement: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Muhammad-Ali v. Final Call, Inc*., 832 F.3d 755, 760 (7th Cir. 2016). The parties here agree that Richardson has a valid sound recording copyright in HPW. The dispositive question is thus whether Richardson has come forth with sufficient evidence to create at least a genuine dispute of fact on the second element—copying of constituent elements of work that are original. The Seventh Circuit has explained that this element actually encompasses two distinct questions: "the first question is whether, as a factual matter, the defendant copied the plaintiff's protected work (as opposed to independently creating a similar work); the second question is whether the copying 'went so far as to constitute an improper appropriation.'" *Design Basics, LLC v. Signature Constr*., *Inc*., 994 F.3d 879, 887 (7th Cir. 2021) (citation omitted).

---

[6] At the time of the prior round of summary judgment briefing, it was also undisputed that Richardson's copyright registration was only for a sound recording. But the parties' briefing was silent as to whether that fact had any impact on the applicable legal standards or the Court's analysis. The Court therefore revisits the legal standards here with a particular focus on the standards applicable to infringement actions involving sound recordings.

The first of these sub-issues is generally referred to as "actual copying" or "copying in fact," and can be proved by either direct evidence or circumstantial evidence. *See id.* Because direct evidence that a defendant copied a work is rare, most cases turn on circumstantial evidence. *Id.* To establish a circumstantial case of actual copying, the plaintiff must provide: "(1) evidence that the defendant had access to the plaintiff's copyrighted work (enough to support a reasonable inference that the defendant had an *opportunity* to copy); and (2) evidence of a [probative] similarity between the plaintiff's work and the defendant's work (enough to support a reasonable inference that copying *in fact* occurred)." *Id.* As to the second question, unlawful appropriation, the inquiry is whether there is a "substantial similarity" between the defendant's work and the protected (original) elements of the plaintiff's copyrighted work. *Id.* at 888.

In short, in order to prove copyright infringement, a plaintiff generally must come forward with sufficient evidence of an opportunity to copy and a probative similarity between the works to support the reasonable inference that the defendant actually copied the plaintiff's original work. *Id.* at 887–88; *see Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984) ("Proof of copying is crucial to any claim of copyright infringement because no matter how similar the two works may be (even to the point of identity), if the defendant did not copy the accused work, there is no infringement."). Further, the plaintiff must come forward with evidence creating the reasonable inference that the protected elements in particular of the plaintiff's work were unlawfully copied. *See Design Basics, LLC v. Kerstiens Homes & Designs, Inc.*, 1 F.4th 502, 503 (7th Cir. 2021) ("[The Court must] separate the protected elements of a work from unprotected elements and then assess whether the protected elements were improperly appropriated.").

2.  Copyright Protections for Sound Recordings

The above general framework applies to all claims for copyright infringement. But there are additional considerations when a plaintiff alleges a claim for copyright infringement in a sound recording. To understand the differences, some additional background on sound recording copyrights is warranted.

When a performance of a musical work is affixed in a medium, such as a physical CD or digital recording, there are two potential copyrighted works: the sound recording itself and the underlying musical composition. *See, e.g.*, *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1289 n.18 (11th Cir. 2011) ("When a copyrighted song is recorded on a phonorecord, there are two separate copyrights: one on [sic] the musical composition and the other in the sound recording.") (citation omitted); *Griffin v. J-Recs.*, 398 F. Supp. 2d 1137, 1142 (E.D. Wash. 2005) ("Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights.") (citations omitted). The Copyright Act defines sound recordings as "works that result from the fixation of a series of musical, spoken, or other sounds . . . regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied." 17 U.S.C. § 101. In other words, the sound recording is the actual physical recording of a particular performance of a musical work. *See* U.S. Copyright Office, *Circular 56: Copyright Registration for Sound Recordings*, at 1 (2021) ("[A] sound recording is a recorded performance . . . [and] must be fixed, meaning that the sounds must be captured in a medium from which they can be perceived, reproduced, or otherwise communicated. The author may fix the sounds in a digital track, disc, tape, or other format.").[7] The musical composition, on the other hand, generally refers to the underlying music and lyrics. *See id.*; *Saregama*, 635 F.3d at 1289 n.18 ("The sound recording is

---

[7] Available at https://www.copyright.gov/circs/circ56.pdf.

the aggregation of sounds captured in the recording while the song or tangible medium of expression embodied in the recording is the musical composition.").

Critically, the copyright in the sound recording covers the recording itself, but not the underlying music, lyrics, words, or other underlying content embodied in the recording. U.S. Copyright Office, *Circular 56*, at 2. Conversely, the copyright in the musical composition covers the underlying musical work, and not a particular recording of that work. *Id.*; *Saregama*, 635 F.3d at 1289 n.18 ("[T]he rights of an owner of a copyright in a sound recording do not extend to the song itself. A copyright in the recording and in the song are separate and distinct and by statute are treated differently."); *Griffin*, 398 F. Supp. 2d at 1142 ("The rights of a copyright in a sound recording do not extend to the song itself, and vice versa.").[8]

This distinction in the types of copyrights is important because the exclusive rights for a sound recording copyright are significantly more limited than those of a musical composition. *See, e.g.*, *Zany Toys, LLC v. Pearl Enters., LLC*, No. CIV.A. 13-5262 JAP, 2014 WL 2168415, at *11–12 (D.N.J. May 23, 2014) ("With respect to copyrights in sound recordings, the Copyright Act confers more limited rights than to other types of copyrighted work.") (citing 17 U.S.C. §§ 106, 114). Under § 106 of the Copyright Act, the holder of a copyright generally has exclusive rights to reproduce and distribute the copyrighted work, prepare derivative works, and in the case of musical works, perform the work publicly. *See* 17 U.S.C. § 106(1)–(5). But § 114 of the Copyright Act limits these rights for the owner of a sound recording copyright. 17 U.S.C. § 114 (a). The exclusive right of reproduction is limited to the right to duplicate the sounds in a form "that directly

---

[8] The U.S. Copyright Office uses the following example to illustrate the distinction between the copyrights: "[T]he song 'Rolling in the Deep' authored by Adele and Paul Epworth and a recording of Aretha Franklin singing 'Rolling in the Deep' are two distinct works. The underlying music and lyrics are a 'musical work,' and a recording of an artist performing that song is a 'sound recording.' U.S. Copyright Office, *Circular 56*, at 2. In other words, there is a copyright in the underlying musical composition authored by Adele and Paul Epworth, and a separate enforceable copyright for the sound recording of Aretha Franklin's cover performance of Adele's song. *See id.*

or indirectly recapture[s] the actual sounds fixed in the recording." § 114(b). The right to prepare derivative works is limited to works "in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality." *Id.* And there is no general right to public performance of a sound recording. While the owner of a musical composition copyright has the exclusive right to public performance of the work by any means, the sound recording owner only has the exclusive right "to perform the copyrighted work publicly by means of a digital audio transmission." § 106(6).

The key common aspect of these statutory provisions is that the rights in sound recordings are limited to direct duplication of the *actual sounds affixed in the recording*, in other words, copying of the actual recording itself. Indeed, the Copyright Act goes on to expressly state that "exclusive rights of the owner of copyright in a sound recording . . . do not extend to the making or duplication of another sound recording that consists entirely of an independent fixation of other sounds, *even though such sounds imitate or simulate those in the copyrighted sound recording*." § 114(b) (emphasis added). This means the rights in a sound recording, unlike a musical composition, do not extend to "sound-alike" works that merely imitate, but do not directly duplicate, the recording itself. *See Romantics v. Activision Pub., Inc.*, 574 F. Supp. 2d 758, 768 (E.D. Mich. 2008) ("[Section 144(b)] expressly disallows any recourse for a sound-alike recording of a song.").

As will be seen further below, the limitation of the rights in a sound recording to the actual duplication of the recording itself, but not imitation or simulation of the sounds in the recording, carries significant implications for plaintiffs like Richardson seeking to establish copyright infringement of a sound recording.

### 3. Establishing Infringement of a Sound Recording

In terms of establishing infringement, the same evidentiary requirements discussed above—proof of actual copying and unlawful appropriation of the protected elements of a work—would apply. But the limitation of the rights in sound recordings to actual duplication means that plaintiffs in sound recording cases are more constrained in how they can establish the first element of actual copying.[9] As noted above, the Copyright Act expressly states that the rights in a sound recording do not extend to works that have been independently recorded and simulate or imitate the sounds of a protected sound recording. 17 U.S.C. § 106(b). This means that "[m]ere imitation of a recorded performance would not constitute a copyright infringement even where one performer deliberately sets out to simulate another's performance as exactly as possible." *Zany Toys*, 2014 WL 2168415, at *11–12 (citing *Midler v. Ford Motor Co.*, 849 F.2d 460, 462 (9th Cir.1988)); *see also VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 884 (9th Cir. 2016) ("Congress intended to make clear [with § 116(b)] that imitation of a recorded performance cannot be infringement so long as no actual copying is done."); *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 800 (6th Cir. 2005) ("This means that the world at large is free to imitate or simulate the creative work fixed in a recording so long as an actual copy of the sound recording itself is not

_____

[9] The Seventh Circuit has not directly addressed whether the standards for proving copyright infringement are different in actions involving sound recordings. There is no reason to doubt that the same general framework—proof of actual copying and unlawful appropriation—apply to claims involving sound recordings. *See, e.g.*, *Batiste v. Lewis*, 976 F.3d 493, 506 (5th Cir. 2020) (applying the same framework in a case involving both sound recordings and musical compositions). It is less clear, however, that the Seventh Circuit's framework for a circumstantial case of actual copying—evidence of access and probative similarity—fits cleanly onto cases involving only sound recordings. While evidence of access would generally be the same regardless of whether the work is a sound recording or musical composition, the term "probative similarity" is not helpful for analyzing sound recording infringement, given that only direct duplication or sampling is prohibited. The fact that two works generally sound similar might be probative of whether an underlying musical composition was copied, but the fact that an infringing work sounds similar to a sound recording is not probative of whether the infringing work is an imitation, which is permitted for sound recordings, or an actual duplication of a recording, which is prohibited. The Court need not resolve this issue in this case, because Richardson's has plainly failed to provide evidence of actual copying as a general matter. The Court merely notes that it has avoided using the word "probative similarity," because it is not apparent that term is relevant for sound recording cases.

made.").

Thus, in order to establish actual copying of a sound recording, a plaintiff must point to evidence supporting the reasonable inference that the actual sounds affixed in the copyrighted recording were physically duplicated. *See generally Zany Toys*, 2014 WL 2168415, at *12 ("[C]ourts have found that copyright protection for sound recordings extends only to duplications of such recordings, not to imitations.") (collecting cases); *Batiste v. Lewis*, No. CV 17-4435, 2019 WL 1790454, at *6 (E.D. La. Apr. 23, 2019) ("To prove infringement of the copyright in a sound recording . . . a plaintiff must prove that his recording was physically reproduced.") (citing *Newton v. Diamond*, 388 F.3d 1189, 1192 (9th Cir. 2004)), *aff'd*, *Batiste v. Lewis*, 976 F.3d 493 (5th Cir. 2020). Evidence that the infringing work merely contains the same underlying musical composition, such as the same generic sounds or lyrics, would not establish sound recording infringement, even if the author of such work deliberately set out to imitate the composition and sounds of the copyrighted recording. *See, e.g.*, *VMG Salsoul*, 824 F.3d at 884 ("A new recording that mimics the copyrighted recording is not an infringement, even if the mimicking is very well done, so long as there was no actual copying."); *Griffin*, 398 F. Supp. 2d at 1142 n.14 ("A performing group that makes a recording that attempts to imitate the style of another performing group's recording does not violate any rights in a sound recording copyright."). These restrictions on the rights in sound recordings, and the proof required to prove infringement, are why sound recording owners are most commonly limited to bringing copyright actions against the tape or record "pirate" who, without permission, makes a direct copy or duplication of the actual recording. *See Griffin*, 398 F. Supp. 2d at 1142.

This does not mean that the owner of a sound recording has no redress for establishing infringement based on copying that falls short of complete duplication of an entire recording.

Sound recording owners do have certain rights to prepare derivative works using the "actual sounds fixed in the sound recording." 17 U.S.C §§ 106(2), 114(b). The creation of new works using previous recordings is known as "sampling," which is the "actual physical copying of sounds from an existing recording for use in a new recording, even if accomplished with slight modifications such as changes to pitch or tempo." *See, e.g.*, *VMG Salsoul*, 824 F.3d at 875 (citing *Newton*, 388 F.3d at 1192 (discussing the history of sampling in music)). The owner of a sound recording copyright generally has the exclusive right to "sample" their own sound recording. *See Bridgeport*, 410 F.3d at 800–01. This means that a copyright plaintiff can establish actual copying if they come forward with evidence of unauthorized sampling of portions of their sound recording. *See, e.g.*, *Batiste*, 2019 WL 1790454, at *6. The plaintiff would then need to establish the second prong of the copying analysis: unlawful appropriation of the protected elements of the copyrighted work.[10]

With all of these legal principles in mind, the Court turns to the specifics of Richardson's infringement claims.

## B. Whether AWAN Actually Copies Richardson's Sound Recording

Kharbouch's primary argument in support of summary judgment is that Richardson has failed to come forward with any evidence demonstrating that AWAN copies the actual sound recording of HPW. (Dkt. 91-1 at 9–13.) Instead, Kharbouch contends that Richardson's evidence of infringement all relates to the manner in which AWAN copies the underlying musical

---

[10] There is a circuit split on the question of whether a plaintiff, once they establish sampling, must still prove unlawful appropriation by showing a substantial similarity between the protected elements of the works. The Sixth Circuit has adopted a bright line rule that *any* unauthorized sampling, no matter how trivial, constitutes infringement. *Bridgeport*, 410 F.3d at 800–01; *accord Batiste*, 976 F.3d at 505. But this holding has been widely criticized. *See, e.g.*, *VMG Salsoul*, 824 F.3d at 884 (rejecting the reasoning of *Bridgeport* and creating a circuit split). The Court need not reach this issue here, however. As will be seen below, Richardson has failed to come forward with evidence that sampling actually occurred, and therefore his claim fails at the actual copying stage, meaning that the Court need not reach the unlawful appropriation inquiry. *See Batiste*, 976 F.3d at 505 (Fifth Circuit declining to take a position on the circuit split, because the plaintiff failed to establish actual copying).

composition of HPW, by using the same melody or certain musical "motifs." (*Id.*) Kharbouch notes, as is discussed in detail in Section A above, that the copyrights in musical compositions and sound recordings are separate and distinct, and the exclusive rights conferred to the owner of a sound recording copyright only apply to the recording itself. (*See* Dkt. 91-1 at 9–12.) Kharbouch argues that a consequence of this difference in copyrights is that Richardson's sound recording registration does not cover the underlying melody of his HWP. Kharbouch thus maintains that Richardson's evidence of any similarity in melodies between AWAN and HPW is irrelevant, and that his claims must be dismissed based on the absence of any evidence that any portion of the actual sound recording of HPW itself has been misappropriated. (*Id.* at 12.)[11]

The Court agrees with Kharbouch. As explained above, a claim for copyright infringement of a sound recording requires evidence that the actual sounds affixed in the protected recording were duplicated. *See, e.g.*, *Zany Toys*, 2014 WL 2168415, at *12. Richardson is not claiming a direct duplication of his entire record of HPW (*i.e.*, pirating), but rather that AWAN is an unlawful derivative that incorporates the same "series of sounds" present in HPW. (Dkt. 51, Am. Compl. ¶ 14; Dkt. 92 at 3.) Richardson's claim is thus one for sampling, which means that he must cite some evidence creating the inference that AWAN actually copies the physical sounds from the digital

---

[11] The Court acknowledges that, in ordering supplemental summary judgment briefing, the Court was primarily concerned with the unresolved issue of whether Kharbouch could be liable for his public performances of AWAN, given that Richardson's sound recording copyright meant that he only had exclusive rights to performances by digital audio transmission. (Dkt. 90.) The Court cautioned the parties not to relitigate legal issues or factual disputes that were previously ruled upon. (*Id.*) Kharbouch's argument that there is no evidence that AWAN infringes the sound recording of HPW runs somewhat counter to those instructions, as the Court previously addressed evidence of infringement in the context of Richardson's affirmative motion for summary judgment. (Dkt. 86 at 19–24.) But the Court finds it appropriate to revisit this issue here. First, the parties failed to address the distinction between musical composition and sound recording copyrights, and the impact of that distinction on Richardson's claims, in their prior briefing, which meant that the Court's analysis of infringement was not entirely on point. *See supra* at n.6. Second, Richardson has responded to Kharbouch's new arguments in his response brief, and therefore has had the full opportunity to be heard on this issue. And finally, the issue is dispositive of Richardson's claim, and it would be inefficient and against the interest of justice to ignore such a dispositive issue merely because of the roundabout manner in which it has been brought before the Court. Therefore, while it would have been more appropriate for Kharbouch to raise this ground for summary judgment in the first round of briefing, it is appropriate to address it here now that it has been properly addressed by the parties.

recording of HPW, even if those recorded sounds have been altered in AWAN. *See, e.g.*, *VMG Salsoul*, 824 F.3d at 875; *see also Fharmacy Recs. V. Nassar*, 248 F.R.D. 507, 528 (E.D. Mich. 2008) (entering summary judgment for defendant on plaintiff's sampling claim, where plaintiff failed to offer proof that his sound recording was duplicated), *aff'd*, 379 F. App'x 522 (6th Cir. 2010).

But while Richardson asserts that AWAN is a sampling of the "digital sounds" of HPW, not merely a copy of its melody or rhythms, (Dkt. 92 at 3), he fails to cite any concrete evidence to back up this claim of direct sampling. Richardson does not cite to any testimony from AWAN's producers or creators as to how they created the music for the song, nor does he point to any expert opinion testimony suggesting that sampling had occurred. Instead, Richardson relies solely on his own observations that he can hear the same series of sounds present in AWAN that are present in HPW, specifically the arrangement of the snare, 808, high hat, rim shot, cymbal, low brass, piano bells, tubular bells, kick drum, strings, soft leads, hard leads, and orchestra hits. (Dkt 92 at 2; Dkt. 92-1 ¶ 1.) Richardson then suggests that "any jury" would be able to hear the same thing, that is, they would hear that the same sounds of HPW are "sampled" in AWAN. (Dkt 92 at 2.) Richardson concludes by asserting, with no citation to any evidence in the record, that digital sampling of sounds from prior recordings frequently happens in the hip-hop and rap industry. (*Id.*)

Richardson's argument in opposition to summary judgment thus essentially boils down to the contention that a jury could find that unlawful sampling—*i.e.*, copying in fact of his protected sound recording—occurred here, because (1) sampling is common in the industry, and (2) HPW and AWAN sound alike. But, based on the record before it, the Court finds that these facts, even if undisputed, are not sufficient to create a triable issue of fact that AWAN actually duplicates or samples the recording of HPW.

As a threshold matter, the record is devoid of any admissible evidence substantiating Richardson's claim that sampling of recordings is common in the hip-hop or rap industry. As noted above, a party opposing summary judgment must point to specific, admissible evidence in the record to create a genuine dispute of material fact for trial. *See Weaver*, 28 F.4th 816. But while Richardson points to a case generally defining the concept of sampling, he cites to no admissible evidence regarding the nature or extent of the practice in the industry at large, let alone any evidence that would substantiate his vague claim that it is "frequent." Regardless of how obvious this point may seem to Richardson, this Court must decide issues on the factual record before it, based on admissible evidence or testimony. Arguments or bald-faced assertions by counsel in briefs do not constitute admissible evidence. *See, e.g.*, *In re Bridgestone/Firestone, Inc., Tires Prod. Liab. Litig.*, MDL No. 1373, 2010 WL 481030, at *3 (S.D. Ind. Feb. 4, 2010) (citing *Box v. A & P Tea Co.*, 772 F.2d 1372, 1379 n.5 (7th Cir. 1985)). The Court therefore cannot take it as an established fact that sampling is frequent as a practice in the hip-hop industry.

But even if the Court could take it as an established fact that sampling of prior recordings is common in the hip-hop and rap industry generally, that would not be sufficient evidence to create the inference that AWAN was created using samples of any portion of the recording of HPW. Unfortunately for Richardson, it appears that he failed to conduct much, if any, discovery, into how AWAN was created. The only evidence in the record before the Court with respect to the creation of AWAN comes from Kharbouch's interrogatory response presented in the prior round of summary judgment briefing. (Dkt. 86 at 6; Dkt. 66-10 at 6.) In response to Richardson's question about the development of AWAN, Kharbouch answered that, to the best of his knowledge, AWAN was conceived of solely by producer Rico Love, who created the music for AWAN while in Miami, and that Kharbouch's only involvement in the production of AWAN was

23

to write and record the lyrics over the music track. (Dkt. 66-10 at 6.) Kharbouch's interrogatory testimony that Rico Love created the music for AWAN is not only undisputed, but is also the only record evidence whatsoever related to the development of AWAN, because Richardson declined to pursue any further discovery on this topic. Richardson did not seek to depose either Kharbouch or Rico Love, or any of the other co-producers of AWAN identified in Kharbouch's interrogatory response, nor does he appear to have sought any written discovery from any of the relevant third parties seeking information about the creation of AWAN. This Court is sympathetic to the inherent costs in litigation, but Richardson chose to bring this action and has the burden of proving his claims based on admissible evidence. And yet, Richardson, who was represented by counsel throughout this case, declined to pursue any meaningful discovery on the creation of AWAN.

In short, there is no evidence indicating how Rico Love created the music for AWAN. Was it a sampling? Or was it an imitation? In the absence of any evidence or testimony as to how AWAN was created, no reasonable jury could answer this question and draw the inference that sampling occurred in this particular case merely because artists in the industry at large may "frequently" rely on prior recordings to create music.

The case of *Batiste v. Lewis* from the Eastern District of Louisiana is instructive on this point. *See* 2019 WL 1790454, at *9. There, the plaintiff, a New Orleans jazz musician, accused the successful hip-hop duo Ryan Lewis and Ben Haggerty, known as "Macklemore and Ryan Lewis," of infringement of several of his musical composition and sound recording copyrights. *Id.* at *1. At the summary judgment phase, with respect to his sound recording claims in particular, Batiste claimed the defendants sampled his recordings, that is, copied the recordings and manipulated the sounds to create their own songs. *Id.* at *8. The defendants responded with sworn statements that they had independently created and recorded their music, and did not use any of

24

Batiste's sound recordings. *Id.* In an attempt to controvert this claim, Batiste attempted to point to evidence in the record that defendants had sampled *other* sound recordings to create their songs, and argued that such evidence of other sampling was circumstantial proof that the defendants had sampled his recording, which would preclude summary judgment. *Id.* The court rejected Batiste's purported evidence of other sampling as immaterial, however. *Id.* The court observed that, while Batiste had cited evidence purportedly showing other artists' sound recordings in defendants' audio files, he had presented no evidence that any of those other recordings were actually sampled or contained in any of defendants' songs. *Id.* And regardless, the court noted that Batiste had not presented any evidence that defendants had actually sampled any of his own works. *Id.* Thus, the fact that defendants may have had other sound recordings in their possession, or may have sampled other songs in the past, was irrelevant, and could not itself establish that sampling had actually occurred with plaintiff's recordings. *Id.* After reviewing the other evidence in the record, including testimony from defendants' experts opining that sampling had not occurred, the court ultimately entered summary judgment for the defendants. *Id.* at 10–12.

While *Batiste* involved affirmative evidence rejecting sampling, including statements by the defendants and expert testimony, the Court finds *Batiste* persuasive for the point that evidence of other sampling in the industry, even other sampling by the same defendants, cannot on its own establish a circumstantial case that sampling (*i.e.*, actual copying) of a plaintiff's song recording in particular actually occurred. Here then, any evidence of sampling in the industry at large, even if properly submitted, would be immaterial and insufficient to establish on its own that Kharbouch, or the creators of AWAN, actually sampled Richardson's sound recording.

All this leaves is Richardson's assertion that "the same series of sounds" can be heard in both songs, and that a jury could therefore listen to the two songs and conclude that unlawful

sampling occurred. To be sure, the Court observed in its prior opinion that, at least to the Court's untrained ear, the underlying music in AWAN sounds similar to the music in HPW. (Dkt. 86 at 24.) And that apparent similarity is not without any evidentiary basis in the record. As noted above, Richardson previously argued in the first round of summary judgment briefing that AWAN copied the melody from HPW. For support, Richardson submitted a report of an expert, Jonathan Pierre, who described HPW as "comprised of an arrangement of seven [musical] motives"—"short musical idea[s] . . . used to develop longer musical expressions like melodies." (Dkt. 69-5 at 3–4.) Pierre opined that AWAN contains "six of the seven motives of HPW in the introduction and subsequent sections, including all verses, choruses, and breakdowns," a similarity he found "shocking." (*Id.*)

But while Pierre's report discusses the similar melodies and compositions of the music in HPW and AWAN, his report notably does not offer any opinion as to whether the actual sounds affixed in the recording in HPW were physically duplicated or sampled to create AWAN. In other words, as Kharbouch points out in his briefing, Richardson's evidence that there is a similarity in the sounds or melodies between AWAN and HPW is not relevant to the issue in this case of alleged sound recording infringement: whether there was duplication or sampling of the actual sound recording of HPW. Recall that Richardson's registration of a sound recording copyright for HPW explicitly does not include the underlying composition or melodies embodied in the recording of HPW. *See* U.S. Copyright Office, *Circular 56*, at 2; *Saregama*, 635 F.3d at 1289 n.18 ("[T]he rights of an owner of a copyright in a sound recording do not extend to the song itself."); *Fharmacy*, 248 F.R.D. at 527 ("The protection afforded sound recordings in a digital sampling case . . . does not extend to the 'generic sound'; it only protects the recorded sound—the stored electronic data digitally preserved by the composer."). This means that Richardson does not have the exclusive

rights to reproduction of the "series of sounds" or melodies in HPW at all, but only rights in the reproduction or sampling of the digital recording of HPW itself.

Richardson thus cannot create a genuine dispute of fact on the issue of actual copying based solely on evidence that AWAN copies the melodies or arrangement of sounds of HPW, because he does not have the exclusive rights in those aspects of HPW. Again, the Copyright Act expressly states that the rights in a sound recording do not extend to imitations or simulations of the sounds of a sound recording, even if done intentionally. *See VMG Salsoul*, 824 F.3d at 884 ("Congress intended to make clear [with § 116(b)] that imitation of a recorded performance cannot be infringement so long as no actual copying is done."). Simply put then, the evidence that sounds in AWAN and HPW sound alike, on its own, is not enough. *See Romantics*, 574 F. Supp at 768. Unless the recording is also registered as a musical composition, Kharbouch or Rico Love, or any artist for that matter, is technically free to intentionally create a piece of music that imitates and simulates the sounds in the recording of HPW. Regardless of how good the imitation is, or how similar the songs sound to the untrained ear, Richardson cannot establish copyright infringement unless there is also evidence that the sound recording of HPW itself was actually duplicated.

This brings the Court back to the point that, unfortunately for Richardson, there is simply no evidence in the record as to how AWAN was actually created. Is it possible that Rico Love created AWAN by directly sampling or duplicating the digital recording of HPW? Perhaps. But it is also just as possible that Rico Love listened to a recording of HPW on SoundClick, and then independently created a track simulating or imitating the same sounds and melodies. The former situation would constitute infringement of Richardson's sound recording, the latter would not. The mere fact that the songs sound alike to the untrained ear, or contain elements of the same musical composition or melodies, does not provide any basis for a reasonable fact finder to decide which

of these situations actually occurred. In short, on this record, absent any testimony of Rico Love or any other individual with knowledge of how AWAN was produced, and absent any expert opinion on the specific issue of sampling, a jury would be left to speculate as to whether the sounds of HPW were physically sampled to create AWAN, or whether AWAN merely imitates the sounds and melodies in HPW. But pure speculation cannot be used to defeat summary judgment. *See, e.g.*, *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir. 1996) ("Speculation is insufficient to withstand summary judgment; the nonmoving party 'must do more than simply show there is some metaphysical doubt as to the material facts.'"). It was incumbent on Richardson to come forward with admissible evidence allowing the reasonable inference that sampling, that is, physical copying, of HPW occurred. The Court finds that he has failed to do so.

The Court has great sympathy for Richardson's situation. He created HPW as a teenager, registered a copyright on his own, and brought this action seeking to protect his rights in his original work of music, as  provided under the Copyright Act. Unfortunately for Richardson, in the Copyright Act, Congress established a very firm distinction between the types of rights associated with a copyright registration of a sound recording, and one for a musical composition. Had Richardson registered for the musical composition in HPW, this case might have been very different, as Richardson would have the exclusive rights to the preparation of derivative works using not just the actual recording of HPW, but also the generic composition.[12] In that case, Richardson's expert evidence as to the similarity of the "sounds" or melodies of the songs likely would have been enough to send this case to trial. But with a sound recording registration only, Richardson's means for establishing infringement are much more limited; he was required to come

---

[12] It is possible for applicants to register recorded works for both sound recording and musical composition copyright protection at the same time when both works are contained in the same recording. *See* U.S. Copyright Office, *Circular 56(a): Copyright Registration of Musical Compositions and Sound Recordings*, 1–3, (2021) (available at https://www.copyright.gov/circs/circ56a.pdf). But Richardson did not do so for HPW.

forward with evidence of actual duplication or sampling of the recording of HPW, not mere imitation of its sounds. If it is any consolation, imitation is the sincerest form of flattery, and the Court hopes that Richardson will not be deterred in his musical endeavors, now armed with a better understanding of copyright law. As it is, though, Richardson's evidence in this particular case is insufficient to establish copyright infringement.

In sum, the Court concludes that the mere similarity in the sounds or melodies between HPW and AWAN is not sufficient to create the reasonable inference that AWAN actually duplicates or samples the recording of HPW. In other words, no reasonable jury could conclude, on this record, that actual copying in fact of the sound recording of HPW occurred here. Put plainly, Richardson cannot bring a claim for copyright infringement of his sound recording based solely on the contention that the songs sound alike. Kharbouch is thus entitled to judgment as a matter of law on Richardson's claims of copyright infringement on this ground alone. Because Richardson has not pointed to sufficient evidence of actual copying, the Court need not address the issue of access or whether AWAN unlawfully appropriates the protected elements of HPW.

### C. Richardson's failure to provide evidence of actual copying renders the parties' remaining disputes moot.

Because the Court has concluded that Kharbouch is entitled to judgment on the grounds of Richardson's failure to provide evidence of actual copying, the Court need not resolve all of the parties' other disputes and arguments raised in their briefing. A few brief comments on some of these issues are warranted, however.

First, the issue that specifically led the Court to allow this supplemental briefing was the question of whether Kharbouch could be held liable for any of his 378 public performances of AWAN, given that Richardson's rights in his sound recording are limited to public performances by "digital audio transmission." While the dispositive issue of Richardson's failure to provide

evidence of actual copying has rendered this performance issue moot, it is worth noting that Richardson has also failed to provide any admissible evidence that any of Kharbouch's 378 performances was done via digital audio transmission. Richardson cites to no evidence related to any of Kharbouch's performances and how they were conducted, but instead, like his arguments with respect to sampling, merely contends that hip-hop and rap performers in the industry generally use digital equipment at their live performances to transmit performances to concertgoers. (Dkt. 92 at 4.). For support, Richardson attempts to rely on unauthenticated internet publications, claiming that the Court can take judicial notice of his sources as establishing the facts of what is common in the industry. (*Id.*) But judicial notice is only proper for facts that are not subject to reasonable dispute, and whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b)(2). Such notice is not proper for unverified internet sources. *See, e.g.*, *United States v. Kmart Corp.*, No. 12-CV-881-NJR-PMF, 2014 WL 11696711, at *2 (S.D. Ill. Sept. 26, 2014) ("The Internet contains a wide variety of information with varying levels of reliability, and a court is not required to take judicial notice of a website's content.").

Regardless, even if the Court could accept Richardson's evidence of what is "common" in hip-hop and rap performances, that would not demonstrate that Kharbouch's performances were done by digital audio transmission. Under the terms of the Copyright Act, performances by digital audio transmission specifically exclude performances of a work in public auditoriums, because the act of "transmission" implies the communication of a work to some place *other* than the place where the performance is made. *See* 17 U.S.C § 101 ("to transmit a performance . . . is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent."); 2 *Nimmer on Copyright* § 8.22 ("[T]he current limitation to transmissions means that publicly performing a digital sound recording within the confines of an

auditorium, for example, remains non-actionable. For, in the auditorium context, the sounds are not 'received beyond the place from which they are sent.'"). There is no evidence in the record that any of Kharbouch's 378 performances was transmitted to any other location, and thus even if they were performed "digitally" in the sense that they incorporated digital audio equipment, they were not "transmissions," and therefore would not infringe any of Richardson's exclusive rights in his sound recording copyright.

Richardson raises a number of other examples of ways in which Kharbouch purportedly facilitates the performance or distribution of AWAN via digital audio transmission, some of which also deserve a brief comment. For example, Richardson argues that Kharbouch has registered his song with a Publishing Rights Organization, which itself generally facilitates the licensing of songs out to the public by digital audio transmission. (*Id.*) But the Court may dismiss this argument out of hand, as Richardson has provided no evidence that AWAN was ever actually transmitted by the publishing rights organization he identifies, let alone that such transmissions were done by digital audio transmission. Richardson also argues that Kharbouch facilitates the transmission of AWAN through YouTube and Apple Music. The Court imagines that these platforms could constitute digital audio transmissions—Kharbouch does not address the question—but the Court need not ultimately resolve the issue. Even if performances of AWAN on YouTube and Apple Music qualified as digital audio transmissions, Richardson's claim still fails as a matter of law based on his failure to prove actual copying discussed above.

In sum then, even if Richardson could establish actual copying and maintain his claim for copyright infringement of his sound recording in HPW, he has failed to come forward with any evidence demonstrating that Kharbouch's live performances of AWAN were done by digital audio

31

transmission. As to the other issues raised in the parties' briefing, the Court need not address them further given Richardson's failure to create a genuine issue for trial on actual copying.

## Conclusion

For all the foregoing reasons, the Court finds that Kharbouch is entitled to judgment as a matter of law. Kharbouch's motion for summary judgment is therefore granted, judgment will be entered in his favor, and the case will be dismissed. The Court notes this is a technical win for Kharbouch, based on the factual and legal record before the Court, which he should not claim as a substantive victory.

ENTERED: 1/4/2024

Nancy L. Maldonado

United States District Court Judge